IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
CASE NO: _____

**CHRISTOPHER LAMACK,**
**WILLIAM OBEID, DANTE**
**MASSARO, and ATIT JARIWALA,**

        Plaintiffs,

vs.

**GE BUSINESS FINANCIAL**
**SERVICES, INC.**

        Defendant.

**COMPLAINT**

Plaintiffs Christopher LaMack, William Obeid, and Dante Massaro, ("Plaintiffs") complaining of Defendant GE Business Financial Services, Inc. ("GE"), allege and state as follows:

### Parties, Jurisdiction, and Venue

1.    Plaintiff Christopher LaMack is a citizen and resident of Mooresville, North Carolina.

2.    Plaintiff William Obeid is a citizen and resident of New York, New York.

3.    Plaintiff Dante Massaro is a citizen and resident of St. Augustine, Florida.

4.    Plaintiff Atit Jariwala is a citizen and resident of Town & Country, Missouri.

5.    Defendant GE Business Financial Services, Inc. ("GE") is for diversity purposes a resident of the State of Delaware by virtue of its incorporation under the laws of the State of Delaware.

6.     GE regularly transacts business within the State of North Carolina. GE's registered agent is CT Corporation and its office is located at 150 Fayetteville Street, Box 1011, Raleigh, Wake County, North Carolina, 27601.

7.     Upon information and belief, GE Business Financial Services, Inc. is a wholly-owned subsidiary of GEI, Inc., which in turn is a wholly-owned subsidiary of GE Capital Corporation, a Delaware corporation.

8.     The amount in controversy exceeds $75,000.00.

9.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332.

10.    This matter involves certain real property located in Franklin County, North Carolina and contracts which relate to the same.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a).

12.    The Court has authority to issue a declaratory judgment and other relief pursuant to 28 U.S.C. §§ 2201 and 2202 because an actual, justiciable controversy exists between Plaintiffs and Defendant concerning the rights of the Plaintiffs under the Limited Joinder and Performance Guaranty documents as described herein.

## STATEMENT OF FACTS

13.    At all times relevant to this matter (except as herein described with regard to Plaintiff Jariwala), Plaintiffs are and were the sole Principals of Gemini Youngsville Crossing, LLC, ("Gemini"), a Delaware limited liability company having an address of 16740 Birkdale Commons Parkway, Suite 306, Huntersville, Mecklenburg County, North Carolina, 28078.

14.    At all times relevant to this matter, Plaintiffs were acting as duly authorized representatives of Gemini, within the course and scope of their representation of Gemini, with regard to Gemini's business dealings with GE.

15.     Up to and through February 2007, Gemini contributed approximately $943,000.00 in equity to certain construction and development costs of a 91,658 net rentable square foot shopping center anchored by Food Lion, CVS Drugstore, including other certain retail buildings, outparcels, and other improvements to land in the City of Youngsville, Franklin County, North Carolina (the "Project").

16.     The Project is managed by Gemini Property Management, LLC ("Gemini Management"). Gemini Management currently manages and leases five retail properties in North Carolina (including the Project), and manages one other retail property in North Carolina. The total leasable square footage of these six North Carolina retail properties is approximately 598,748.

17.     On or about February 14, 2007, Gemini entered into a Loan Agreement (the "Loan Agreement") with Merrill Lynch Capital, a division of Merrill Lynch Business Financial Services, Inc. ("Merrill Lynch"), which in turn is, upon information and belief, a subsidiary of Merrill Lynch & Company.

18.     Through the Loan Agreement, Merrill Lynch agreed to make a loan of up to Seventeen Million Eight Hundred Twenty Five Thousand dollars ($17,825,000.00) (the "Loan") to Gemini for construction and development costs of the Project. A true and correct copy of the Loan Agreement is attached hereto as <u>Exhibit A</u>.

19.     The Loan is further evidenced by a promissory note in the principal amount of Fifteen Million Fourteen Thousand, Four Hundred Eighty Six dollars ($15,014,486), dated February 14, 2007 ("Note A").

20.     The Loan is also evidenced by a second promissory note, in the principal amount of Two Million Eight Hundred Ten Thousand Five Hundred Fourteen dollars ($2,810,514), dated

February 14, 2007 ("Note B") (Note A and Note B are collectively referred to herein as (the "Promissory Note").

21.     On or about February 14, 2007, Plaintiffs entered into a Limited Joinder (the "Limited Joinder" with Merrill Lynch in connection with the Loan Agreement (the Limited Joinder is contained within the Loan Agreement attached hereto as Exhibit A).

22.     Purportedly pursuant to the Loan Agreement and the Limited Joinder, 20% of the Loan amount was recourse until the Project was 48% leased and Merrill Lynch Capital received $5.6 Million in net proceeds from the sale of Project outparcels to pay down the loan.

23.     On or about February 14, 2007, Plaintiffs entered into a Performance and Completion Guaranty with Merrill Lynch ("Performance Guaranty"). A true and correct copy of the Performance Guaranty is attached hereto as Exhibit B.

24.     In connection with the Loan, certain other agreements, further described in the Loan Agreement, were executed (collectively, the "Loan Documents").

25.     Among other Loan Documents executed in connection with the Loan, Gemini executed a Deed of Trust (the "Deed of Trust").

26.     On or around October 14, 2008, GE sent a Notice to Gemini stating that Merrill Lynch Business Financial Services Inc. had changed its name to GE Business Financial Services Inc. (the "Notice").

27.     According to the Notice, the change effected no assignment or transfer of the "Lender's interest."

28.     According to the Notice, Lender's address changed to GE Business Financial Services, Inc., 500 West Monroe, Chicago, IL 60661.

29.     Shortly after receipt of GE's Notice, a change of personnel occurred, including the loan and loan administration officers overseeing Gemini's Loan.

30.     As set forth in more detail below, following the name change, there occurred a dramatic and material change in the business dealings between Gemini and the creditor.

31.     Upon information and belief, GE acquired the rights to the Loan and Loan Documents through a much more complicated transaction than was represented to Gemini.

32.     According to Merrill Lynch and Company's first quarter 10-Q U.S. Securities and Exchange Commission ("SEC") filing for the quarter ended March 28, 2008, GE's SEC 10-K filing for the fiscal year ended December 21, 2007, and GE's First Quarter Earnings Presentation, GE acquired approximately $13 Billion in Merrill Lynch notes and mortgage loans on February 4, 2008, presumably including Gemini's Loan Agreement.

33.     GE's specific purchase discount applicable to Gemini's loan is unknown. However, during GE's 2008 First Quarter earnings Wall Street analyst conference call, GE indicated that they acquired Merrill Lynch's $13 Billion mortgage portfolio for approximately $6 Billion or around fifty cents on the dollar.

34.     On or around October 31, 2008, Gemini made a formal written request to GE for modifications to the Loan, which were necessary given the economic conditions occurring as a result of the housing and credit crisis.

35.     Despite clearly understanding changed real estate economic conditions necessitating loan modifications and the need to fund tenant improvements, GE repeatedly failed to formally respond to this and numerous subsequent requests for Loan modifications made by Gemini.

36.     On or around April 6, 2009, Gemini entered into an Agreement with McDonald's USA, LLC ("McDonald's") for the purchase of an outparcel on the Project.

37.     On or around July 16, 2009, Gemini sent a letter to GE requesting approval of the sale of the outparcel property to McDonald's.

38.     On or around July 24, 2009, GE denied approval of the sale of the outparcel property to McDonald's, claiming the request did not conform to the description of Release Parcels described in the Loan Documents and that there was insufficient evidence to satisfy conditions in the Loan Agreement regarding the release of parcels.

39.     On or around August 19, 2009, Gemini requested that GE approve the sale of a parcel of Project property to Mark Ellington; reallocate and disburse Holdback funds for Tenant Improvements as contemplated by the Loan Documents; and modify certain loan terms.

40.     On or around August 19, 2009, Gemini sent additional materials in response to concerns raised by GE with regard to the sale of the outparcel property to McDonald's in its July 24, 2009 letter.

41.     On or around August 25, 2009, GE responded to Gemini's previous letter, addressing only the issue of the reallocation and disbursement of Holdback funds in connection with Tenant Improvements. GE stated that it was unable to decide the matter without additional information.

42.     In its August 25, 2009 letter, GE once again failed to address Gemini's request for Loan modifications, despite GE's publicly stated understanding of the importance of funding tenant improvements and making loan modifications.

43.     On or around August 28, 2009, GE sent another letter reiterating the denial of approval for the sale of the outparcel property to McDonald's, now claiming that a request would need to be reviewed by its internal Credit Committee.

44.     GE stated it would not submit any request to its Credit Committee unless Gemini executed acceptable documentation in connection with GE's suggested Loan modifications.

45.     Further, GE denied the release of property to Mark Ellington and declined to make nearly every Loan modification requested by Gemini. GE did agree to reallocate Holdback funds intended for Capital Improvements to Tenant Improvements, however GE would not approve payment of any brokerage leasing commissions.

46.     On or around October 2, 2009, GE sent a letter to Gemini notifying Gemini of certain alleged deficiencies in the production of financial documents of Plaintiff Jariwala. In clear disregard of the cure provisions of the Loan Agreement, which provide for a 30-day cure period for non-monetary breaches, GE demanded that Gemini cure the breach within 10-days.

47.     GE also stated that it would take no further action with regard to requests made by Gemini or any further disbursements of Holdback funds until Gemini cured the Loan Agreement breaches in connection with the financial records of Plaintiff Jariwala. At this point, Plaintiff Jariwala was no longer a Principal and, to the best of Gemini's knowledge, Plaintiff Jariwala had previously complied with previous demands made by GE with regard to his financial records.

48.     On or around October 5, 2009, Gemini notified GE that McDonald's was ready to close on the outparcel property. Gemini provided further documentation demanded by GE in order to receive GE's approval of the sale.

49.     On or around October 7, 2009, GE still refused to approve the sale of the outparcel property to McDonald's. GE further stated it would only approve the sale with certain conditions.

50.     Upon information and belief, GE had around this time discovered an error in the Deed of Trust.

51.     The Loan Agreement and the Note identify the lender as "Merrill Lynch Capital, a division of Merrill Lynch **Business** Financial Services Inc., a Delaware corporation" (emphasis added). *See* Exhibit A.

52.     However, the "beneficiary" indentified in the Deed of Trust is "Merrill Lynch Capital, a division of Merrill Lynch **Capital** Financial Services Inc., a Delaware corporation" (emphasis added).

53.     Thus, the beneficiary of the Deed of Trust is not identified as the same party as the holder of the note or the lender making the Loan.

54.     As a consequence, the Deed of Trust is not valid and proper security for the Loan. In fact, the validity of the Deed of Trust is now pending in an action before the Honorable Judge Howard E. Manning, Jr. in the Superior Court in Franklin County, North Carolina, Civil Case Number 10 SP 127.

55.     Upon information and belief, GE was withholding approval of the sale of the outparcel property to McDonald's in an attempt to compel Gemini to admit that the error was a scrivener's or minor error.

56.     On numerous occasions, GE attempted to compel Gemini to agree that the identification of Merrill Lynch Capital Financial Services, Inc. in the Deed of Trust was a "scrivener's error" or other minor error and to waive any claims regarding the same.

57.     During negotiations surrounding the release of the outparcel to McDonald's, GE strongly sought to have Gemini agree to waive all claims as to errors in the Deed of Trust and claims of lender liability.  Gemini refused to agree to any such waivers.

58.     On November 12, 2009, Gemini and GE finally entered into an Amendatory Agreement, which amended and modified certain provisions of the Loan Agreement in order to secure GE's approval of the release of the outparcel property to McDonald's.

59.     Gemini entered into the Amendatory Agreement solely because it was the only way GE would approve the release of the sale of the outparcel to McDonalds, which was a necessary transaction considering the economic realities facing the Project.  Gemini specifically did not waive any claims as to errors in the Deed of Trust or as to claims of lender liability.

60.     On November 14, 2009, counsel for GE sent a letter to Gemini stating that "Lender is proceeding with the McDonald's sale on the basis that the Deed of Trust scrivener's error has been corrected and that Borrower is acknowledging the same."  Gemini had in fact not made any such acknowledgements, nor made any waivers as to claims relating to the error in the Deed of Trust.

61.     On November 16, 2009, counsel for Gemini responded to counsel for GE stating that Gemini had not acknowledged that the error in the Deed of Trust had been corrected. Counsel for Gemini vehemently noted the unprofessional approach taken by GE's counsel, stating "The Lender must understand the Borrower is not agreeing or acknowledging the affidavit is sufficient.  Your attempt to twist my words to support the Lender's position is both incorrect and unprofessional.  Advocacy of your client's position is entirely appropriate; however, twisting my emails to say things you know full well they don't mean is completely inappropriate."

62. On or about November 17, 2009, the closing was held for the sale of the outparcel property to McDonald's, paying $643,202.70 in sales proceeds to GE.

63. Following November 17, 2009 McDonald's closing, Gemini again requested that GE begin negotiations for a global settlement concerning Loan modifications. GE represented to Gemini that it "[i]n response to Corinne's question earlier this afternoon concerning the global settlement proposed by Borrower, GE is prepared to turn to discussing these issues promptly after the closing of the McDonald's Sale."

64. GE, however, was unwilling to negotiate unless Gemini agreed to waive all claims relating to the error in the Deed of Trust and all claims in regard to lender liability.

65. On or around January 8, 2010, Gemini again requested the reallocation of Holdback funds, explaining it had completed the defined Capital Improvements and pursuant to the Loan Agreement, Holdback Funds could be reallocated upon completion of any category.

66. In its January 8, 2010 letter, Gemini enclosed an executed Pre-Negotiation Agreement for the purposes of completing loan modifications.

67. On or around January 11, 2010, GE offered further resistance to the loan modification process by stating that the Pre-Negotiation letter sent by Gemini was not the approved form. GE continued to refuse any loan modification unless Gemini waived all claims regarding the Deed of Trust and lender liability.

68. On January 19, 2010 and again on February 9, 2010, GE sent a Notice of Breach to Gemini. Following the Notices of Breach, Gemini continued its good faith efforts towards a workout or a loan modification all while still working to secure new leases, conduct outparcel sales, and keep the property well maintained in order to maximize the value of the Project.

- 10 -

69.     On or around March 15, 2010, Gemini requested approval of a lease to Verizon Wireless. The lease was a relatively small lease and customarily would not require extraordinary conditions.

70.     On or around April 6, 2010, GE responded to Gemini's March 15, 2010 with a conditional approval of the Verizon lease contingent upon the execution by Verizon of a subordination and attornment agreement, as well as an agreement that the broker would not be paid from cash flow from the property, as is customary.

71.     Neither of the conditions imposed by GE for the approval of the Verizon lease had been imposed on any previous leases. Moreover, the lease itself contained automatic subordination language covering GE.

72.     Throughout its attempts to negotiate a loan modification and a possible workout of the loan, Gemini advised GE of its belief in the potential success of the Project as well as the detrimental effect that would result to the Project should GE not continue to fund the construction loan and provide flexibility for modifying release prices of the outparcels and minimum rental rates for new leases. Gemini maintained that the success of the Project hinged on loan administration reflecting the true nature of the current market, particularly as to leasing rates, tenant improvements, and outparcel sales.

73.     GE clearly understood the paramount importance of maintaining flexibility as to Loan terms and disbursements as well as the importance of attracting good credit tenants. Numerous statements to GE's shareholders, pension fund investors and the public demonstrated this understanding. According to a GE Capital Real Estate White Paper, "Depending on the situation, managers may offer new lease terms to existing tenants, actively solicit new ones, and anticipate and address any physical issues, from lighting to elevators to cleanliness. In fact,

- 11 -

though it seems counterintuitive in a time of stretched budgets, there is a renewed emphasis on capital expenditures, with tenants being attracted to buildings that can offer tenant improvements." The GE White Paper continues by commenting on the importance of maintaining and improving properties to retain and even attract tenants, stating "the cash flow this eventually generates translates directly into property value."

74. However, from the time GE acquired the loan at a substantial discount and throughout the time that GE served as loan administrator, GE refused to allocate Holdback funds for Tenant Improvements, refused to fully fund certain draws requests by Gemini, refused to approve leases at market rates, refused to evaluate leases at market rates, refused to permit outparcel sales, and imposed on Gemini requirements extraneous to the Loan Documents.

75. Throughout the course of dealings with Merrill Lynch, Gemini received 100% of the requested draw proceeds in an average of 16.69 days. Throughout the course of dealing with GE, Gemini received 88% of the requested draw proceeds in an average of 42.5 days. Specifically, GE refused to release funds for such items as brokerage commissions, miscellaneous items, and construction upfit.

76. Upon information and belief, GE has acted in bad faith as described herein in an attempt to directly impair the value of the Project, and in doing so, increase the liability of the Principals under the Limited Joinder. Specifically, GE was aware that under the Loan Agreement and Limited Joinder, 20% of the Loan was recourse until the Project was 48% leased and $5.6 Million in net proceeds from the sale of the outparcels had been received. GE's conduct in refusing to consider potential leases, refusing to fully fund draws, and resisting outparcel sales was conducted in bad faith and meant to ensure the impossibility of reaching the

Property leasing and outparcel sale contingencies releasing the Principals from the recourse provisions of the Loan Agreement and Limited Joinder.

77. Upon information and belief, GE acted in bad faith as described herein in an attempt to purposefully seek foreclosure, obtain the Project property and collect, as a windfall over their discounted purchase price of the Loan, the substantial sum purportedly guaranteed by the Principals in the Limited Joinder and Performance Guaranty.

78. An indication of GE's business strategy is revealed on a December 9, 2009 Fourth Quarter earnings Wall Street analyst conference call, when GE remarked, "[w]e will work with our strong borrowers to restructure loans and extend maturities. But if the borrowers' not managing the property to maximize performance, and our repayment, we are not afraid to foreclose on the assets and manage it ourselves with our strong equity asset management capabilities. ... And in fact, since the time that we've foreclosed, and taken ownership, our asset management teams have been able to improve the operating performance of these assets quite dramatically. And are now working, in fact, with new partners on opportunities to reposition those assets, to sell the assets into joint ventures, and to continue to add value and eventually exit the assets over time."

79. Upon information and belief, there are numerous cases where this division of GE is alleged to have engaged in the same pattern of conduct evidenced in this current action: purchasing a third party loan at a substantial discount, refusing to negotiate or modify the purchased loan's existing terms, refusing to fund under the previous Loan Agreement, refusing to approve parcel sales or leases, aggressively pursuing foreclosure actions, bidding a minimum value at foreclosure, and then aggressively pursuing personal guarantees irrespective of whether a monetary deficiency actually exists.

80.     To date, Gemini has invested approximately $1,648,347 of equity in the Project. A substantial portion of this equity was contributed because GE refused to fund for such needs as Tenant Improvements, which were necessary to compete in the current real estate market.

81.     To date, Gemini has sold three outparcels (First Citizens Bank, CVS Pharmacy, and McDonalds) and has paid to Lender an additional approximate $2,680,056.27 in proceeds from those sales.

82.     As discussed above, an action is pending before the Honorable Judge Howard E. Manning, Jr. in the Superior Court of Franklin County, North Carolina.  In that action, GE through its Substitute Trustee is seeking to foreclose on the Project property.

83.     Additionally, an action is also currently pending in the North Carolina Business Court before the Honorable John R. Jolly, Jr. with a Civil Case Matter Number of 10 CVS 388. In that action, Gemini brings various claims based on the egregious loan administration and other acts or omissions of GE similar to those described herein.

84.     On or around June 7, 2010, GE sent via overnight courier, a written Notice ("Notice") regarding Gemini's alleged default and informing the Plaintiffs (as Principals) that GE is demanding immediate payment from the Plaintiffs of approximately $3.5 Million.  The Notice further informs the Plaintiffs that GE will pursue the approximately $3.5 Million without further notice regardless of the right to have a receiver appointed and the right to exercise the power of foreclosure sale.

85.     Plaintiffs, both by virtue of their status as Principals in Gemini and as signatories of the Limited Joinder (*See* Exhibit A) and the Performance Guaranty (*See* Exhibit B), have been damaged by the wrongful acts and omissions of GE as described herein.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment as to the Limited Joinder and the Performance Guaranty)

86.     Plaintiffs incorporate by reference the allegations of paragraphs 1-85 as if fully set forth herein.

87.     As alleged above, GE has made demand upon the Plaintiffs for personal guaranty obligations pursuant to the Limited Joinder and Performance Guaranty.

88.     The Limited Joinder and Performance Guaranty contain provisions which are manifestly unjust and unreasonable, including, but not limited to, the following:

   a.   Paragraph 2(g) of the Limited Joinder, which purports to be a waiver of all rights and defenses of the Plaintiffs under the Limited Joinder by virtue "any acts or omissions of Lender which vary, increase or decrease the risk on any Principal;"

   b.   Paragraph 3(b) of the Limited Joinder, which purports to grant GE the authority, without notice to or consent from the Plaintiffs, to "modify the terms of any document evidencing, securing or setting forth the terms of the loan;" and

   c.   Paragraph 3(c) of the Performance Guaranty, which purports to be a waiver of "any defense, right of set-off or other claim which Guarantor or Borrower may have against Lender or the holder of the Note."

89.     Upon information and belief, the Limited Joinder and Performance Guaranty are not binding or enforceable on the Plaintiffs by virtue of the fact that material provisions of the same (a) are vague and ambiguous, (b) are unconscionable, (c) are void as against public policy, (d) would unjustly enrich Defendant if enforced, (e) would entitle Defendant to more than full satisfaction of its claim in violation of § 815 Illinois Compiled Statutes 115/6, and (f) in such other particulars to be adduced through discovery and introduced at trial.

90. Upon information and belief, Plaintiffs as Guarantors under the Limited Joinder and Performance Guaranty are or may be entitled to assert one or more defenses or rights affecting the enforceability of said documents which GE contends have been waived by virtue of the language of the documents themselves.

91. Plaintiffs and GE's dispute concerning the validity and enforceability of the Limited Joinder and the Performance Guaranty is a justiciable controversy, and as this Complaint demonstrates, an actual controversy exists between parties having adverse interests.

92. As GE is now asserting a right to enforce the personal guaranty obligations of the Limited Joinder and the Performance Guaranty its actions are causing, or threaten to cause, actual harm to Plaintiffs.

93. Consequently, there is an actual and substantial controversy between Plaintiffs and GE of sufficient immediacy and reality to warrant the rendering of a declaratory judgment by this Court.

94. Pursuant to 28 U.S.C. §§ 2201 and 2202, Plaintiffs are entitled to a judgment declaring the parties' rights as requested herein.

95. Plaintiffs request that this Court settle and afford relief with respect to the parties' rights and status concerning the Limited Joinder and Performance Guaranty.

## SECOND CLAIM FOR RELIEF
### (Breach of the Contract)

96. Plaintiffs incorporate by reference the allegations of paragraphs 1-95 as if fully set forth herein.

97. Pursuant to the Loan Documents, GE, if certain conditions were met, was required to reallocate Loan proceeds such that such funds could be used for items other than their initially designated use. Further, pursuant to the Loan Agreement, GE was required to make

disbursements of certain portions of the Loan funds if certain conditions under the Loan Documents were met.

98. Despite the fact that Gemini met the conditions required for reallocation, GE failed and refused to reallocate Loan proceeds.

99. Despite the fact that Gemini met the required conditions for loan disbursements, GE still failed to timely and fully disburse Loan funds to Gemini.

100. As a result, Gemini was not able to utilize the Loan proceeds as permitted in the Loan Documents.

101. As a consequence, and by failing to make disbursements (a) in a timely manner and/or (b) of all of the funds to which Gemini was entitled including but not limited to certain draw requests, Gemini was precluded from timely completing certain construction and build out of tenant spaces.

102. As a result, Gemini was forced to self-fund certain payables and trades believed to be the lender's responsibility.

103. Further, due to the aforementioned, Plaintiffs and Gemini were further harmed, as GE's actions and inaction precluded Gemini from attracting as many potential tenants to the Project as it otherwise could have.

104. Thus, GE's actions resulted in a diminution of the number of tenants, reduced leasehold rental rates, and thus, reduction in net operating income at the Project.

105. Thus, GE breached the Loan Agreement, and Plaintiffs by virtue of their status as Principals of Gemini and as signatories to the Limited Joinder and Performance Guaranty are entitled to damages as a result, in an amount to be determined by the trier of fact.

## THIRD CLAIM FOR RELIEF
### (Breach of the Contract)

106.     Plaintiffs incorporate by reference the allegations of paragraphs 1-105 as if fully set forth herein.

107.     Pursuant to the Loan Documents, GE, if certain conditions were met, was required to reallocate Loan proceeds such that such funds could be used for items other than their initially designated use.

108.     While Gemini met the conditions required for reallocation, GE failed and refused to reallocate Loan proceeds.

109.     Further, due to the aforementioned, Plaintiffs and Gemini were further harmed, as GE's actions and inaction precluded Gemini from attracting as many potential tenants to the Project as it otherwise could have.

110.     Thus, GE's actions resulted in a diminution of the number of tenants, reduced leasehold rental rates, and thus, reduction in net operating income at the Project.

111.     Thus, GE breached the Loan Agreement, and Plaintiffs by virtue of their status as Principals of Gemini and as signatories to the Limited Joinder and Performance Guaranty are entitled to damages as a result, in an amount to be determined by the trier of fact.

## FOURTH CLAIM FOR RELIEF
### (Breach of the Covenant Good Faith and Fair Dealing)

112.     Plaintiffs incorporate by reference the allegations of paragraphs 1-111 as if fully set forth herein.

113.     Under North Carolina law, every contract contains an implied covenant of good faith and fair dealing.  This covenant requires parties to a contract to act upon principles of good

faith and fair dealing to accomplish the purpose of their agreement, and imposes a duty to adhere to the presuppositions of the contract for meeting this purpose.

114. By failing to timely and fully disburse Loan funds to Gemini, by failing to reallocate Loan proceeds in order to enable Gemini to further the completion of the Project, GE hindered Gemini's ability to complete the Project.

115. Further, GE rejected potential leases and/or refused to evaluate potential lessees of the Project and outparcel sales related thereto for reasons that were arbitrary, capricious, and not raised in good faith.

116. In addition, GE unreasonably delayed the evaluation of leases and lessees for approval in bad faith.

117. Moreover, GE attempted to impress unreasonable terms to its approval of leases, seeking, among other things, Gemini's waiver of certain of its rights, as preconditions for approval.

118. Further, GE refused to fund brokerage commission and tenant improvements contrary to normal good faith lending practices.

119. GE engaged in a pattern of behavior that was not in good faith, designed to try to create cause for default, and/or otherwise cause Plaintiffs and Gemini harm.

120. For the reasons set forth above, GE breached the covenant of good faith and fair dealing.

121. As, GE breached the covenant of good faith and fair dealing, Plaintiffs by virtue of their status as Principals of Gemini and as signatories to the Limited Joinder and Performance Guaranty are entitled to damages as a result, in an amount to be determined by the trier of fact.

## FIFTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

122. Plaintiffs incorporate by reference the allegations of paragraphs 1-121 as if fully set forth herein.

123. During the course of business, GE made material misrepresentations, including, but not limited to, the fact that it was willing to enter into negotiations for loan modifications, including modifications to the provisions governing the allocation and disbursements of Holdback funds. Upon information and belief, GE never intended to negotiate loan modifications as evidenced by its repeated unreasonable resistance to the negotiation process and its repeated refusal to allocate and disburse Holdback funds, yet GE nevertheless supplied those misrepresentations to Plaintiffs and Gemini knowing them to be false.

124. Plaintiffs were denied the opportunity to fully investigate the true facts and could not have learned the true facts by the exercise of reasonable diligence.

125. As Gemini's lender and in the process of negotiating loan modifications, GE owed a duty of care to Gemini and the Plaintiffs.

126. Plaintiffs were reasonably justified in relying on GE's representations that it would enter into negotiations regarding loan modifications.

127. Plaintiffs did in fact rely on GE's representations to its detriment.

128. As GE made negligent misrepresentations upon which Plaintiffs were justified in relying and upon which Plaintiffs did actually rely to their detriment, Plaintiffs have been damaged in an amount in excess of $10,000.

## SIXTH CLAIM FOR RELIEF
### (Negligent Loan Administration)

129.    Plaintiffs incorporate by reference the allegations of paragraphs 1-128 as if fully set forth herein.

130.    As Gemini's lender and in the process of negotiating loan modifications in an attempt to workout the loan, GE owed a duty to Plaintiffs and Gemini to exercise the degree of care, knowledge, intelligence and judgment in the use of its skill in the management of the Loan Agreement.

131.    GE breached the duty owed to Plaintiffs and Gemini by ignoring loan modifications requested by Gemini, by unreasonably withholding approval of the sale and lease of Project parcels, by imposing conditions extraneous to the Loan Agreement, by refusing to fund brokerage commission, by failing to, in good faith, enter into loan modification negotiations and by otherwise, as set forth above, acting in bad faith.

132.    As a direct and proximate result of the foregoing actions and omissions, Plaintiffs by virtue of their status as Principals of Gemini and as signatories to the Limited Joinder and Performance Guaranty are entitled to damages as a result, in an amount to be determined by the trier of fact.

## SEVENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

133.    Plaintiffs incorporate by reference the allegations of paragraphs 1-132 as if fully set forth herein.

134.    A fiduciary relationship existed between GE and Plaintiffs based on the facts set forth above, including the degree of control exercised by GE over the Project, the representations

made by GE to Gemini, GE's role as the Loan administrator, and GE's requirement that Plaintiffs execute the Limited Joinder and Performance Guaranty.

135. As described in this Complaint, GE failed to act in good faith and with due regard for Plaintiffs and Gemini's interests.

136. As a direct and proximate result of the foregoing breach of fiduciary duty, Plaintiffs have been damaged in an amount in excess of $10,000.00.

## EIGHTH CLAIM FOR RELIEF
### (Breach of Contract as to the Limited Joinder and Performance Guaranty)

137. Plaintiffs incorporate by reference the allegations of paragraphs 1-136 as if fully set forth herein.

138. As described in this Complaint, GE has breached the terms of the Loan Agreement, breached the implied covenant of good faith and fair dealing, made negligent misrepresentations, negligently administered the loan, and breached its fiduciary duty.

139. GE's actions described in detail above were exercised in bad faith and in attempt to impair the viability and success of the Project. Specifically, GE acted in bad faith in an attempt to decrease the value of the company and thereby increase the purported liability of the Plaintiffs under the Limited Joinder and Performance Guaranty.

140. As a direct and proximate result of GE's actions exercised in bad faith the viability and the success of the Project has been substantially impaired.

141. As a direct and proximate result of GE's actions, the value of the Project has been substantially decreased and as such, the Limited Joinder and Performance Guaranty entered into by the Plaintiffs should be declared void and unenforceable.

## NINTH CLAIM FOR RELIEF
### (Unfair and Deceptive Trade Practices)

- 22 -

142. Plaintiffs incorporate by reference the allegations of paragraphs 1-141 as if fully set forth herein.

143. GE's actions and omissions alleged herein were unlawful, unfair and deceptive, and affected commerce within North Carolina and constitute unfair or deceptive trade practices under N.C.G.S. § 75-1.1 et seq.

144. As a direct and proximate result of the foregoing unlawful, unfair and deceptive actions and omissions, Plaintiffs have been damaged in an amount in excess of $10,000.00 and is entitled to have said damage trebled pursuant to G.S. § 75-16.

145. Pursuant to G.S. § 75-16.1, Plaintiffs are also entitled to recover from Defendant their reasonable attorney's fees incurred in prosecuting this action.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully requests that this Court grant the following relief:

1. Determine the rights and liabilities of the parties under the Limited Joinder and Performance Guaranty and enter a declaratory judgment, as a matter of law, that the Limited Joinder and Performance Guaranty are void and unenforceable;

2. Order that Plaintiffs have and recover judgment against Defendant for breach of contract in an amount to be determined at trial;

3. Order that Plaintiffs have and recover judgment against Defendant for breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial;

4. Order that Plaintiffs have and recover judgment against Defendant for Negligent Misrepresentation;

5. Order that Plaintiffs have and recover judgment against Defendant for Negligent Loan Administration;

6.      Order that Plaintiffs have and recover judgment against Defendant for Breach of Fiduciary Duty;

7.      Order that Plaintiffs have and recover judgment against Defendant for Unfair and Deceptive Trade Practices.

8.      Grant Plaintiffs trial by jury on all issues so triable; and

9.      Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 9th day of June, 2010.

BAILEY & DIXON, LLP

/s/ David S. Wisz_____
David S. Wisz
North Carolina State Bar No.: 22789
David S. Coats
North Carolina State Bar No.: 16162
Michael L. Weisel
North Carolina State Bar No.: 9516
Jeffrey D. McKinney
North Carolina State Bar No.: 39907
P.O. Box 1351
Raleigh, North Carolina 27602
Telephone: (919) 828-0731
Facsimile: (919) 828-6592
*Attorneys for Plaintiffs*